Alfred PIRONE, Daniel F. Guthrie, Vito V. Ferrara, Charles A. Barker, Jr., and Charles R. Buchheit, Jr., Plaintiffs,

v.

The HOME INSURANCE COMPANY, Defendant.

Nos. 79 Civ. 2417 (RLC), 79 Civ. 4925 (RLC), 79 Civ. 6642 (RLC) and 80 Civ. 2454 (RLC).

United States District Court, S.D. New York.

March 1, 1983.

Anderson, Russell, Kill & Olick, P.C., New York City, and McKenna & Schneier, Valley Stream, N.Y., for plaintiffs; Arthur S. Olick, Andrew P. Brozman, New York City, Patrick M. McKenna, Valley Stream, N.Y., of counsel.

Kelley, Drye & Warren, New York City, for defendant; Martin D. Heyert, Paul L. Bressan, Howard M. Loeb, Thomas B. Kinzler, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

*Background Facts and Issues*

These are five actions commenced by individual plaintiffs—Alfred Pirone, Charles A. Barker, Jr., Vito Ferrara, Daniel Guthrie and Charles Buchheit—all former employees of defendant, The Home Insurance Co. ("Home"), alleging that their terminations violated the Age Discrimination in Employ-

ment Act ("ADEA" or "the Act"), 29 U.S.C. § 621 *et seq.* The five cases were consolidated for all purposes. On June 17 and 18, 1982, prior to proceeding to trial on the merits, an evidentiary hearing was held to determine whether Guthrie, Ferrara, Barker and Buchheit had met the statutory requirements permitting them to process their claims in this forum.[1] At the close of the hearing, the court dismissed Guthrie's and Ferrara's claims as untimely but held that Barker and Buchheit had met the ADEA jurisdictional requisites. Accordingly, their claims proceeded to trial on the merits along with those of Pirone.

The terminations of Pirone, Barker and Buchheit resulted from a change in command at Home. In February, 1978, Peter Huang became de facto chief executive of the company, although that title was not officially conferred on him until several weeks later. Nonetheless, he asserted his putative authority at once. Huang testified that when he took command of the company, he considered Home's operations inefficient and top heavy. He regarded the payroll as unduly burdensome and the overhead excessive. He disapproved of power being concentrated in New York and characterized as wasteful the committee system through which all the company's decision-making was accomplished before he took control. He abolished the committee structure immediately and took steps to transfer some operational and decision-making authority from New York to the field. Huang asked the senior officers to look at their departments to determine which of their operations could function just as efficiently and effectively with fewer employees. He testified that he set no guidelines because he thought the senior officers would know what yardsticks to use to comply with his directive.

In purported compliance with Huang's orders, Pirone and Barker were terminated by their superiors. The issue to be determined is whether their termination was based on valid non-discriminatory criteria or was motivated by considerations of age offensive to the Act.

Huang and Buchheit seem to have clashed from the outset. Huang asked Buchheit for an accurate head count of Home employees, was dissatisfied with the method Buchheit employed in getting the figures, and regarded the total Buchheit gave him as unreliable. Moreover, Huang was not happy with the personnel department, which was Buchheit's operation, and felt it had to be overhauled. In determining whether Buchheit's termination was legitimate or discriminatory, the court, unlike in the case of Pirone and Barker, cannot look to objective criteria alone. In light of the highest reaches of management which Buchheit occupied, the personal and subjective determination of Home's chief executive that Buchheit was not competently performing his duties and responsibilities cannot be discounted. Indeed, Huang's subjective evaluation concerning Buchheit, unless shown to be pretextual, insincere or irrational, may be sufficient in his case to defeat a charge of purposeful discrimination in this disparate treatment claim. *Rogers v. International Paper Co.,* 510 F.2d 1340, 1345–46 (8th Cir.), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975).

*Plaintiffs' Employment and Termination*

Alfred Pirone first became a Home employee on August 7, 1944. He worked as an examiner in the underwriting department for the bulk of his career with the company. He worked in various supervisory positions in the central processing department before being transferred to the systems department in 1973. He was released on April 14, 1978, without prior notice but remained on the payroll until July 31, 1978. At the time of his termination, he was 59 years of age and had been with Home for nearly 34 years of uninterrupted employment.

Charles Barker began his employment at Home on July 7, 1969. He served in the casualty administration, systems and policy administration departments before being

---

1. It had been determined in an opinion filed on February 6, 1981, that Pirone had filed a timely charge of age discrimination consistent with the requirements of the Act.

transferred in December, 1976, to the personal lines underwriting department. Although he remained on the payroll until April 28, 1978, his employment at Home was terminated physically on April 21, 1978, without prior notice. He was 49 years of age when discharged and had not acquired vested pension rights at the time. Thus his loss of employment at Home is not cushioned by receipt of any pension benefits.

Charles Buchheit, Jr. began his employment at Home on June 1, 1949. He became an assistant secretary on December 1, 1959, and served thereafter as secretary, vice president and senior vice president. When he became vice president in 1972, he was assigned the position of personnel officer of the company. He was advised of his termination by Joseph Quinn, then senior vice president in charge of internal services. Buchheit was physically terminated on May 31, 1978, but remained on the payroll until December 31, 1978. Quinn testified that Buchheit had stated that he was going to retire at age 62. He was only 60 years old in 1978. Quinn arranged for Buchheit to receive monies from the company's corporate funds to supplement his regular pension benefits under the Home Retirement Plan. Under this arrangement, Buchheit, as of January 1, 1979, began to receive the same monthly payments to which he would have been entitled had he in fact retired at age 62.

Prior to being terminated, Pirone does not appear to have had any indication from his superiors that his work was unsatisfactory. However, Pirone's upward movement had stopped in 1972. Thereafter he was demoted from manager to senior expense analyst in 1972, and from senior expense analyst to senior analyst microfilm in 1973. When terminated, Pirone was assistant project coordinator in the claims redesign project unit. The unit was staffed by four employees—Patricia Martini, who headed the unit, Pirone, Helena Grebis and Dolores Mangold. Both Grebis and Mangold were considerably younger than Pirone.

The decision to terminate Pirone was made by Edward Murray, vice president in charge of the systems department. Murray testified that he chose to let Pirone go because the unit could function adequately with two rather than three employees, and it was his belief that Pirone's termination would have the least impact on the unit's operational capabilities. He believed the two women retained had performed better and had greater future potential. In addition to these two women, a number of employees in other units in the systems department younger than Pirone were retained. Pirone was never offered the opportunity to accept one of the positions in which these younger employees were retained.

Barker, at termination, was a personal lines supervisor in the auto casualty unit of the personal lines underwriting department. Prior to April, 1978, Barker had had several confrontations with his supervisors for misinforming them about what had happened in the field and for disregarding explicit instructions. In December, 1977, he did an assigned risk audit in Philadelphia. Some of his criticisms were found to be invalid, and he was said to have been guilty of activities in connection with that assignment that violated company rules and regulations. In 1978, he was sent to a field office in New Jersey with specific orders not to get involved in the audit which was underway at that location. Disregarding these instructions, he interjected himself into the auditing process and criticized the manner in which the audit was being conducted. Thus, not only was Barker guilty of insubordination, but his supervisor testified that Barker's criticisms had no merit. Early in 1978, Barker scheduled an assigned risk audit of the Metropolitan field office although his superiors had given him specific instructions not to conduct any audits after the problems which resulted from his 1977 assignment in Philadelphia.

John J. Kennedy, an assistant vice president, was asked by Robert Sink, senior vice president in charge of the personal lines underwriting department, to determine what employees and positions could be eliminated with the least adverse impact on the operations of the department. At the time,

three units were functioning in the department. Kennedy, after a conversation with David Brooks, Barker's immediate supervisor, and Vincent Buda, Brooks' boss, decided to let Barker go. Kennedy testified that he had taken the Philadelphia, New Jersey and Metropolitan field office incidents into account in deciding to terminate Barker. Moreover, he complained that Barker had spent time collecting useless data on Class 2 involuntary automobile risks because he had grouped married males who were not in the Class 2 risks category with youthful unmarried males.

At the time the plaintiffs were terminated, Stephanie Boutwell was Home's affirmative action officer, and Buchheit was a member of the affirmative action committee, which continued to function in April, 1978, despite Huang's order dismantling the committee system. Murray and Kennedy submitted Pirone's and Barker's names to Boutwell among the list of employees to be terminated.

Boutwell reviewed with Murray and Martini, the basis for the decision to fire Pirone, and with Kennedy, the reasons for the decision to terminate Barker. She was told that Pirone was a slow worker and not a self starter, and that Barker had engaged in misconduct and was inefficient. The proposed terminations were reviewed by the affirmative action committee and adopted as not violating any federal anti-discrimination laws or regulations. Buchheit participated in and approved that determination. Boutwell thereafter advised Murray and Kennedy of the committee's conclusion that neither termination raised any ADEA problem.

Although Murray and Martini advised Boutwell at the time of the affirmative action review that Pirone was a slow worker and not a self starter, Martini only a few months earlier had made a performance evaluation of Pirone in which no mention of

these deficiencies appeared. When confronted at trial with this inconsistency, Martini testified that at the time of the evaluation, she did not have the heart to mention those specific weaknesses in her report.

*Determination*

In prior decisions Pirone, Barker and Buchheit were found to have filed timely charges of ADEA violations with the Secretary of Labor.[2] Since I see no reason to modify these earlier determinations at this time, we now proceed to the merits.

The ADEA forbids an employer from terminating an employee between the ages of 40 and 65 because of age,[3] and the claims of ADEA violations presented here constitute allegations of disparate treatment because of age. To prevail, each plaintiff must show that Home terminated him because of his age, refused to retain him because of his age or regarded age in each instance as a negative factor warranting termination. *Williams v. General Motors, Inc.,* 656 F.2d 120 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). In short, the plaintiffs must prove that age in each case was the motivation for their terminations. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–364 n. 15, 97 S.Ct. 1843, 1854–69 n. 15, 52 L.Ed.2d 396 (1977).

The order and allocation of proof posited by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and its progeny in a disparate treatment case are applicable here. A prima facie ADEA case is established when each plaintiff shows that he (1) belongs to the protected class, (2) was terminated, and (3) despite satisfying normal job performance requirements, was fired in favor of the retention of younger persons or was fired and replaced by younger persons. While defendant has presented evidence in

---

**2.** Pursuant to Reorganization Plan No. 1 of 1978, Section 2, all functions of the Secretary of Labor in respect of the administration of ADEA were transferred to the Equal Employment Opportunity Commission, 43 Fed.Reg. 19807, 92 Stat. 3781 (1978).

**3.** A 1978 amendment effective January 1, 1979, raised the outer age limits to 70. 29 U.S.C. § 631(a) (Supp. II 1978).

all three instances of unsatisfactory job performance, at this initial stage we look at the plaintiff's evidence alone.

▪ The indicated criteria need not be rigidly followed in every case. *Id.* at 802, 93 S.Ct. at 1824. Indeed, the significance of *McDonnell* is "its recognition of the general principle that any [ADEA] plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters, supra,* 431 U.S. at 358, 97 S.Ct. at 1866. Accordingly, a departure from the *McDonnell* formula becomes appropriate "when common sense dictates the same result on the basis of alternative formulae." *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1014 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).

The evidence is clear that Buchheit's replacement was a younger employee, but this is not so clear with respect to Pirone or Barker. Younger employees were kept, but it is not established on this record that these employees were doing the same work Pirone and Barker had done prior to layoff. What is beyond dispute is that neither man was offered the opportunity to work in his own or a related department, in positions in which employees below 40 years of age were retained.

◀ Nonetheless, the requisite elements essential to satisfy a plaintiff's initial burden have been met in all three cases. Plaintiffs' evidence establishes that they are members of the protected class and were terminated despite satisfying job requirements. In Pirone's and Barker's cases, younger employees were retained in jobs that could have been offered to them, although the assignments might not exactly mirror what either plaintiff had been doing before termination. Buchheit's temporary and permanent successors were younger than he.

Accordingly, having established a prima facie case, the burden now shifts to the defendant "to articulate some legitimate,

non-discriminatory reason for the employee's rejection." *McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. The court need not be persuaded that defendant was motivated by the proffered reason. While the evidence must be legally sufficient to justify judgment for defendant, the burden is met if defendant's evidence simply raises a genuine issue of fact as to whether unlawful discrimination was implicated. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

The defendant has presented evidence in each case to show that no discrimination was at work. In Pirone's case, the evidence shows that although Pirone had not lost ground in salary (indeed he was at a higher rate of pay) since 1974, he had been given a series of positions which were graded lower than his prior position and, therefore, required less responsibility and carried less prestige. He was given a good evaluation prior to his termination. Although Martini now seeks to explain away this final evaluation on the ground of sentiment, the evaluation is accepted at face value. However, the two younger persons retained in his unit received evaluations that were at least comparable to Pirone's.

In Barker's case, defendants have presented evidence showing that Barker violated company policy and the direct orders of his superiors, made misrepresentations to his superiors which caused difficulties between the New York office and the Philadelphia field office, and incompetently performed an assigned task.

In Buchheit's case, Huang, as indicated, had very strong views that Buchheit was not competently performing his duties as a senior officer of the company and that his department needed overhauling.

These reasons are sufficient to satisfy the defendant's burden at this stage as to Barker and Buchheit. There can be no question that an employer accused of discriminatory discharge establishes a legitimate non-discriminatory basis for the termination by proving that the employee was released for good cause. Buchheit was at the highest

level of power and responsibility at Home, and the subjective evaluation of his chief that he should be let go must be accorded great respect.

Plaintiff argues in reference to Pirone's evaluation that it really was not used to compare employees, that at best Mangold had only one point higher than Pirone, and that Murray recommended Pirone for reemployment as recorded in an advice of personnel change dated April 18, 1978. Moreover, plaintiffs contend that the department was subsequently enlarged and additional personnel added, yet Pirone was not rehired or offered the opportunity of reemployment.

Plaintiff seeks to discount the reduction of Pirone from manager grade 22 to senior expense analyst grade 18 in 1972, and his subsequent transfer to the position of systems analyst microfilm in 1973, with another demotion in grade. There was testimony that he performed poorly during the period that he was senior expense analyst, but plaintiff argues that this should be discounted because of a temporary lack of concentration on the job due to a personal tragedy. Defendant seeks to explain the April 18, 1978 recommendation for reemployment as a courtesy extended to all.

While plaintiffs' arguments have force in Pirone's case, defendant's evidence standing alone raises "a genuine issue of fact as to whether it discriminated against" Pirone, and is legally sufficient to satisfy judgment in its favor. *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094. That is all that is required for defendant to meet its burden at this level of our inquiry.

The inquiry now moves to its third and final stage, with plaintiffs being given the opportunity to establish that the proffered reasons given by defendant in meeting its burden are pretextual. Plaintiffs' burden of rebutting the employer's evidence of non-discriminatory reasons for the discharges now merges with the claimants' ultimate burden of persuading the court that the employer's acts constituted intentional discrimination. This may be done directly by persuading the court that a discriminatory reason more likely motivated Home or by showing that the employer's proffered reasons lack credence. *Id.* 101 S.Ct. at 1095.

Plaintiffs have failed to convince the court that these terminations were related to plaintiffs' age.

Barker's and Buchheit's cases need not detain us long. There was a sufficient showing of Barker's disobedience of his superiors' orders and of his incompetence to justify his termination. In Buchheit's case, Huang, as chief executive, had wide discretion in determining who his chief deputies would be. Huang was dissatisfied with Buchheit's performance. There is nothing to indicate that this dissatisfaction was feigned. It is not sufficient to show that the former chief was satisfied with Buchheit. Huang was new and thought the former chief had tolerated what Huang regarded as incompetence. While Huang's evaluation was subjective, Buchheit has not shown that it was arbitrary or irrational.

The systems department where Pirone worked had increased in numbers of employees during 1977, but that department, like all of Home's departments, was faced with a mandate from Huang in 1978 to reduce staff. The argument that Pirone for his long services with the company should have been retained is not persuasive. While Pirone could not have been terminated because he was over 40, Home was not required to retain him over younger employees just because he was over 40. The Act does not require that employees 40 years of age or older be given a preference. *See, e.g., Williams v. General Motors, Inc., supra,* 656 F.2d at 129; *Teal v. State of Conn.,* 645 F.2d 133, 139 (2d Cir.1981), *aff'd,* —— U.S. ——, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). To paraphrase Judge Friendly's statement in *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980), the ADEA does not require that an employer choose those whom the court considers most qualified, it requires only that the employer's decision not be discriminatory. When an employer decides to fire one person rather than another and his determination is reasonably

attributable to an honest though partially subjective evaluation of the employee's qualifications, no inference of an ADEA violation can be drawn.

While statistical evidence showing a general pattern of age discrimination is relevant in an individual disparate treatment case, *see generally McDonnell, supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825, the statistics presented by plaintiffs to show a pattern of age discrimination at Home were fatally flawed. The fact that entry level employees are uniformly younger than persons terminated clearly has no significance. Logic would seem to suggest that this would be the natural order of things. As was stated in *Langesen v. Anaconda Co.,* 510 F.2d 307, 313 n. 4 (6th Cir.1975), "[I]t is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market while younger ones move in. For this reason hiring data which is contrasted with termination data is virtually useless in any realistic analysis of a claim of disparate treatment because of age. It is only logical to assume any institution that wants to survive will be constantly acquiring young new hires and losing old employees through termination or retirement."

When young employees leave a job, the likely prospect is that they will be replaced by young people. On the other hand, when older employees leave a job, their replacements are more likely to be younger than those who left. *Id.; See also Kerwood v. Mortgage Bankers Association of America, Inc.,* 494 F.Supp. 1298, 1306 (D.D.C.1980). Statistical data comparing the age of the terminated employees in the New York office with the age of those retained in that office, *Schwager v. Sun Oil Company of Pennsylvania,* 591 F.2d 58, 59 (10th Cir. 1979), or comparison of the percentage of employees between 40 and 65 terminated with the percentage of 40 to 65 year olds retained in the defendant's work force might have been relevant, *Marshall v. Sun Oil Co. (Delaware),* 605 F.2d 1331, 1333 (5th Cir.1979), *reh. denied,* 610 F.2d 818 (5th Cir.1979), but no such credible data was offered.

Plaintiffs sought to compare data of Home's 1978 terminations in New York with data taken from the national urban work force and from nationwide unemployed in 1978. This makes little sense. In addition, the samples used were sometimes too small for anything meaningful to be decided; in one instance only 16 or 18 people comprised the data base. *See generally Wade v. New York Telephone Company,* 500 F.Supp. 1170, 1180 (S.D.N.Y.1980) (Carter, J.).

Plaintiffs seek to rely on *Franci v. Avco Corp.,* 538 F.Supp. 250 (D.Conn.1982), but such reliance is misplaced. There the court found direct evidence of discriminatory intent. A memorandum had been sent out by a member of top management indicating that there were too many elderly employees on hand and younger ones should be brought in. There were also statements from another top management official that his function was to get rid of the older employees and a statement by a third that there would be a layoff of older employees. With that smoking gun in evidence, the court would have been hard pressed not to find a discriminatory motivation. There is no such evidence here.

There has been no credible testimony that top management at Home felt overloaded with old employees and was seeking ways to get rid of them. Huang, who triggered the action resulting in the terminations that created this litigation, never indicated that older employees were to be the targets of the reduction he sought. Indeed, he set no yardsticks. He indicated to his senior officers that the staff needed trimming and urged each department head to look at his work force to determine whether his department could function efficiently with fewer employees. Before a termination was effected, the targeted employee's name was sent to the affirmative action officer. She consulted with the affirmative action committee and advised whether, in the committee's judgment, the proposed termina-

tions raised any questions in reference to the anti-discrimination laws. In Pirone's case, Buchheit, who was on the committee, agreed that Pirone's termination did not violate the ADEA.

Of course, this procedure does not insulate defendant's act from scrutiny to determine whether the procedure used was a charade to shield the discrimination actually practiced. However, the acquiescence of one of the plaintiffs in the discharge of Pirone as not offending the Act certainly undercuts, if not annihilates, any contention that the affirmative action committee review to ensure compliance with ADEA requirements should not be viewed seriously.

The insurance claims fare no better. Home's retirement plan provides for vesting after years of credited service. While age is a factor, vesting is related to time in the plan not chronological age, and an employee could become fully vested at age 32. Accordingly, absent other clear indicia of purposeful discrimination based on age, the actuarial evidence is irrelevant.

Moreover, there is no credible testimony that Home looked at the impact of the plaintiffs' termination on its retirement plan while the termination decision was being considered. The evidence is that after termination Buchheit was offered the option of early retirement and allocated a special grant in addition to what he would receive from the plan to bring his retirement income up to the level it would have reached had his retirement been postponed until he reached age 62. Pirone took steps about the retirement plan after termination. As to Barker, there is nothing in the record to indicate that his status in the retirement plan influenced his superiors' decision to let him go. In short, there is no proof that Home considered the financial effect on its retirement plan of the decisions to terminate these men. Even if it had, it is doubtful that this would have been actionable. *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 922 (2d Cir.1981).

It should be added parenthetically, at least, that the court finds nothing in the recent decision of Judge Sand in *EEOC v.*

*Home Insurance Co.,* 553 F.Supp. 704 (S.D. N.Y.1982), pertinent to or inconsistent with the decision here.

*Conclusion*

Since plaintiffs have failed to satisfy their ultimate burden of persuasion that their terminations were age related, their cases are dismissed and judgment in each instance is awarded the defendant.

IT IS SO ORDERED.