James N. **PERRY**, Plaintiff,

v.

**PRUDENTIAL–BACHE SECURITIES, INC., Defendant.**

**Civ. A. No. 88–342 (MTB).**

United States District Court, D. New Jersey.

Oct. 30, 1989.

Ford, Marrin, Esposito & Witmeyer by William P. Ford, Montclair, N.J., for plaintiff.

Epstein, Becker & Green by Richard J. Reibstein, Princeton, N.J., for defendant.

OPINION

BARRY, District Judge.

I. INTRODUCTION

This is an age discrimination case. Plaintiff James N. Perry (hereinafter "Perry") filed the present action against his former employer, Prudential–Bache Securities, Inc.

(hereinafter "Pru–Bache"), alleging that he was unlawfully terminated in violation of the Age Discrimination In Employment Act, 29 U.S.C. §§ 621–634 (hereinafter "ADEA"). Pursuant to the ADEA, Perry seeks reinstatement to his former position, as well as damages. *See* Amended Complaint, paras. 28–39. Perry has also brought pendent claims under both New York and New Jersey law, asserting, *inter alia*, that his termination violated public policy with respect to fair employment practices. *Id.* at paras. 40–47. Perry, who was a highly compensated executive with over thirty years of experience at Pru–Bache, seeks total damages well in excess of $10,000,000.00. *See* Amended Complaint, paras. 51(1)–51(5).

Present before the Court is the motion of Pru–Bache for summary judgment as to all of Perry's claims. For the reasons that follow, Pru–Bache's motion will be granted.

II. FACTS

IIa. *Background*

Perry was born on November 14, 1930, and graduated from Yale University with a bachelor's degree in 1952. After serving in the United States Army as a First Lieutenant, he undertook graduate work in business studies at New York University in 1956. *See* Plaintiff's Memorandum Of Law In Opposition To Motion For Summary Judgment (hereinafter "Perry Opposition Brief") at 5; Deposition of James N. Perry, taken on December 7 and 19, 1988 (hereinafter "Perry Dep.") at 6 (deposition attached to the Affidavit of Ronald M. Green, sworn to August 17, 1989 (hereinafter "Green Aff.") at Exh. B.)). In 1956, Perry joined Halsey, Stuart & Co., Inc., a predecessor firm to Pru–Bache, as a trainee. Perry Opposition Brief at 5. In 1958, he was promoted to the Municipal Bond Department as a junior underwriter. *Id.* at 6. In 1973, at which time Perry was serving as the Manager in the Municipal Bond Department, Bache & Co. acquired Halsey, Stuart & Co. After the merger of these two firms, which were then constituted as Bache Halsey Stuart Inc., Perry was made Manager of National Underwriting. Perry

continued in this position until 1981, when the Prudential Insurance Company of America acquired Bache Halsey Stuart and formed the entity which constitutes the present defendant, Prudential–Bache Securities, Inc. (Pru–Bache). Amended Complaint at paras. 9, 10; Perry Dep. at 18–19.

In his position as National Manager of Underwriting for Pru–Bache, Perry was in charge of the firm's underwriting activities involving both competitive and tax-exempt bond issues. *Id.* at 8; Deposition of Gerald P. McBride, taken on December 29, 1988 and February 16, 1989 (hereinafter "McBride Dep.") at 10–11 (deposition attached to the Green Aff. at Exh. C.). He was chiefly involved in establishing pricing systems for the bonds, that is, setting a competitive interest rate that would be both high enough to attract investors, but low enough to also be attractive to the sponsor of the bonds. Perry Dep. at 11–12.

The job of National Manager of Underwriting, while a position of considerable importance involving tens of millions of dollars, carried with it comparatively few broad management responsibilities. As the National Manager, Perry was responsible for supervising five underwriters in New York and receiving reports from the trader underwriters located in Pru–Bache's twelve regional offices. Perry Dep. at 13–14; McBride Dep. at 11; Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment (hereinafter "Pru–Bache Movant Brief") at 7.

The parties do not dispute the fact that Perry enjoyed an excellent reputation in his capacity as an underwriter. His job evaluations consistently show that he was respected throughout the bond industry and that he performed the underwriting functions of his job with great skill. Pru–Bache Movant Brief at 7; McBride Dep. at 14, 26; Indeed, one of his supervisors summarized his performance as of January, 1983, as follows: "Jim is still recognized as the premier competitive underwriter in our business. He is also one of the smartest people in the municipal industry. He has helped public finance on a number of very important presentations this year. We ranked # 2 in competitive underwriting this year." Perry Opposition Brief at 9; Affidavit of William P. Ford, sworn to September 8, 1989, (hereinafter "Ford Aff.") at Exh. I.

Despite this clear recognition of Perry's skill as an underwriter, his immediate supervisor, Gerald P. McBride (hereinafter "McBride"), who was then serving as Manager of the Municipal Department, held reservations concerning Perry's ability to carry out the managerial, as opposed to the underwriting, tasks of his job. McBride Dep. at 24–26. McBride believed that Perry was a poor communicator, aloof, and did not follow matters in his office in sufficient detail. *Id.* at 27.

In March, 1985, a reorganization of Pru–Bache took place. The Municipal Department (along with the Public Finance Department) was merged into a newly created group, the Tax–Exempt Division. Pru–Bache Movant Brief at 8. McBride became the manager of this Division. As a consequence of his promotion, McBride's former job as Manager of the Municipal Department became vacant. McBride Dep. at 7. McBride's immediate supervisor, James Glynn, (hereinafter "Glynn"), who was then serving as Executive Vice President in charge of the Fixed Income Group, recommended that Perry be promoted to fill McBride's former position as Manager of the Municipal Department. McBride objected to Perry's promotion to manager of the bond department, and expressed his reservations, outlined above, directly to Glynn. McBride Dep. at 19–20. He reiterated these objections at a meeting which was held with the Chairman of the Board, George Ball (hereinafter "Ball"). McBride Dep. at 21–22. It was, nevertheless, Glynn's position that Perry deserved a chance to become "a manager" and, in March, 1985, Perry was promoted to the position that McBride had formerly held. McBride Dep. at 23; Pru–Bache Movant Brief at 9. It was this position, with its vastly greater responsibilities and managerial scope, and in which Perry earned $350,000 per year, from which he was dismissed eighteen months later, in October, 1986. It is this dismissal which he challenges before

this Court as having been undertaken in bad faith and in violation of the ADEA.

During the period in which Perry served as Manager of the Municipal Department, i.e., from March, 1985, to October, 1986, several personnel changes took place in the management structure immediately above the position in which Perry served. While Perry's immediate supervisor continued to be McBride, the duties of McBride's own supervisor (Glynn) were taken over by James T. Gahan (hereinafter "Gahan") who, in May, 1985, became President of the Capital Markets Group. Deposition of James T. Gahan, taken on February 15, 1989 (hereinafter "Gahan Dep.") at 5, 8–9 (deposition attached to Green Aff. at Exh. D.). Pru–Bache Movant Brief at 10. In May of 1986, however, Gahan was promoted to President of Capital Funding, and one Leland Paton (hereinafter "Paton") took over Gahan's former position as President of Capital Markets. Gahan Dep. at 64; Pru–Bache Movant Brief at 10. At the time Perry was dismissed in October, 1986, the immediate command structure over the position he held as Manager of the Municipal Department, in ascending order, was as follows: 1) McBride (previous supervisor for two and one half years, now Director of the Tax–Exempt Division); 2) Paton (President of Capital Markets); 3) Gahan (President of Capital Funding).

## IIb. *Perry's Performance As Manager of the Municipal Department*

Perry's new position as Manager of the Municipal Department involved new and greatly expanded duties. In addition to overseeing his replacement as chief underwriter, Perry was required to handle trading, retail sales development, and the firm's new research efforts in the bond area. Perry Dep. at 25. He was required, as well, to actively oversee and manage the personnel in the regional offices, whereas in his former position he had merely been required to guide the trader underwriters in the local offices. Perry Dep. at 26–27; Pru–Bache Movant Brief at 9. He, thus, moved from a position in which he was primarily engaged in underwriting and the supervision of his five key underwriters in New York (and the regional trader underwriters in the local offices) to the active supervision of all of the regional bond work, a job encompassing the supervision of over 130 employees. Perry Dep. at 42–43, 25; Pru–Bache Movant Brief at 9.

Perry's supervisors were not happy with his management of the Municipal Department. The concerns of Messrs. McBride, Paton and Gahan were grouped into four categories, each of which will be reviewed in more detail below. As an overview, however, these four areas can be summarized as follows. First, his supervisors felt that Perry's day to day management of the Municipal Department was far too loose in that he failed to provide adequate supervision and guidance to his subordinates. They also complained that he failed to properly supervise expense accounts, and failed to visit the regional offices with any frequency. Pru–Bache Movant Brief at 12–13. Second, his supervisors were frustrated that he resisted following their request that he "mark-to-market" the firm's own bond holdings in a manner describing high and low periods of profitability. Pru–Bache Movant Brief at 14–15. Third, his supervisors were dissatisfied with the level of profitability of the bond section. Pru–Bache Movant Brief at 15–17. Finally, his supervisors were concerned about the relationship between Gahan and Perry, which had become so strained that these two top managers were barely on speaking terms at the time of Perry's discharge. Pru–Bache Movant Brief at 17–20.

As to the first concern regarding Perry's management of the day to day affairs of the Municipal Department, several events stand out as being relevant to the present motion. While Perry has described his management style as being "open" and one in which he avoided trying to give his subordinates "too much over-supervision", it is clear that his supervisors wanted a tougher "hand's on" approach. *See* Perry Dep. at 138; *compare* Gahan Dep. at 65; McBride Dep. at 47, 85–86, 138–139. The consequences of Perry's loose management style became apparent to McBride when he began to receive numerous complaints from

Perry's subordinates in the field that Perry did not provide leadership or direction to the salesmen and underwriters from the regional offices. McBride Dep. at 35, 150–151. In addition, the immediate personnel that Perry supervised in New York, that is, the Head Trader, the Manager of the Regional Municipal Department, and the National Manager of Municipal Underwriting, also brought similar complaints to McBride. McBride Dep. at 34–39, 85–87, 149–152.

In addition to these general leadership complaints, McBride became dissatisfied with Perry's handling of the department's more mundane tasks. McBride's criticisms included: 1) allowing the desks in the office to be undermanned through inadequate supervision of personnel scheduling; McBride dep. at 147, 162; Green Aff. at Exh. A, Documents 000487–000490;[1] 2) improper supervision of employee expense accounts, including one instance in which a Pru–Bache employee was allowed to use company funds to purchase Christmas gifts for other employees; McBride dep. at 166; and 3) Perry's departure for a vacation without informing his secretary or McBride.

McBride dep. at 142–143; Green Aff. at Exh. A, Document 000487.

As to the second concern regarding Perry's dispute with top management about the most efficacious way to "mark-to-market"[2] the firm's bond holdings, McBride and particularly Gahan were dissatisfied with Perry's handling of this aspect of his job. Indeed, it was on this point perhaps more than any other that Perry's performance was criticized. Gahan had specifically requested that the bonds be marked up as well as down in order to gauge both profits and losses. Pru–Bache Movant Brief at 14; Gahan Dep. at 14–16. Perry did not feel that marking up was required, and resisted his supervisors' instructions on this point. Both McBride and Gahan expressed their wishes to Perry in a series of inter-office memoranda and through office meetings which were held on this subject. Gahan Dep. at 16–17; McBride Dep. at 170–174; Green Aff., Documents 000499–000502. As McBride summarized the situation regarding the disagreement between Perry and the firm on this point:

> At that time, Mr. Gahan was constantly on my back to get Mr. Perry to follow

---

**1.** Documents 000487–000490 attached as Exhibit A to the Green Affidavit are particularly telling. These documents consist of brief notes made by McBride during the course of Perry's employment summarizing points of criticism and other general topics regarding Perry's performance which McBride wished to discuss with Perry. McBride Dep. at 136, 140, 149, 162. In addition to focusing on lack of supervision of the desks in the office, they contain notes on other problems discussed above including, for example, the name of an employee in the Underwriting Department who left the company because he felt he was not receiving adequate guidance from Perry.

Most critically, nowhere in Perry's submissions does he specifically refute these notes or, indeed, any of the broader assertions made throughout the testimony elicited at the depositions. While Perry asserts that most if not all of McBride's concerns were never directly communicated to him, this fact, if it be fact, has no relevance to the present motion. *See, e.g., Pierce v. New Process Co.,* 580 F.Supp. 1543, 1545 (W.D.Pa.1984), *aff'd. mem.,* 749 F.2d 27 (3rd Cir.1984) ("[T]he Company is under no obligation to warn plaintiff of complaints regarding his performance and, if anything, the effect of such evidence is equivocal, perhaps indicating that plaintiff was receiving the benefit of the doubt"). *Id.*

In addition, Perry asserts that most if not all of Pru–Bache's evidence should be given little weight, in that the bulk of this evidence was compiled only after Pru–Bache learned of Perry's intention to sue upon his claim for age discrimination. *See* Perry opposition Brief at 18. While I agree that self-serving, post facto explanations must be approached with caution, *see Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1215 (3rd Cir.1988), I have found nothing in Perry's affidavits or briefs—other than the bald assertion of "post-hoc justification"—to demonstrate that Pru–Bache's assertions were spurious or recently constructed. Moreover, were plaintiff's logic taken to its logical extreme, a defendant employer would be precluded from ever proffering evidence in the regular course of discovery which could not be labeled as "post hoc" justifications.

**2.** Pru–Bache describes the "mark-to-market" process as the means by which a securities firm keeps track of the value of the bonds it holds for its own account. The degree of specificity with which a securities firm can track the high and low value of the bonds it holds determines the precision of its calculation of profit and loss on those securities. *See* Pru–Bache Movant Brief at 14.

the directions, whether he liked it or didn't like it. These are the rules and he had to follow those rules.

It got to the point where there was constant calling to me by Mr. Gahan about Mr. Perry's resistance to doing what we told him to do.... It got so bad that Mr. Gahan almost *refused to* speak to Mr. Perry ...

McBride Dep. at 177.

As to the third area of concern, it was clear that Perry's supervisors believed that Perry was not generating the level of profits which they believed could have resulted from the very favorable market conditions which existed during the months in which he served as Manager of the Municipal Department. While the parties dispute the role that Perry played in generating the substantial profits that the firm in fact enjoyed during that period of time,[3] it is clear that top management believed that any "warm body" could have generated the same profits. McBride Dep. at 90, 167; Gahan Dep. at 37–42, 53–56, 65–66; Paton Dep. at 40–42; Green Aff. at Exh. A, documents 000497–000498; *cf.* Perry Opposition Brief at 10. Indeed, after Perry had been in his new job for five months, and Gahan had reviewed his performance in handling the firm's bond positions, Gahan recommended to McBride that Perry's employment be terminated. Gahan Dep. at 37–38.

Finally, as to the fourth area of general concern, and particularly in light of the events described above, it is clear that Perry's relationship with both McBride and Gahan had to deteriorated to a rather low level. It was Perry's belief that McBride circumvented his authority in the management of his department, Perry Dep. at 101, ultimately describing McBride as being "pigheaded". *Id.* at 109; Pru–Bache Movant Brief at 19.

After Paton become the President of Capital Markets, he, too, determined that it would be in the best interests of the firm to terminate Perry's employment. Paton dep. at 61–65, 71–73. Thus, by mid–1986, Paton, Gahan and McBride had determined to release Perry from employment. They also agreed to give Perry a severance package which would continue his salary through October of 1987 and pay him his regular bonus for 1986. McBride Dep. at 97–98.

## IIc. *The Termination Decision*

In the course of determining Perry's severance package, McBride drew up a very short memo to himself, which he apparently referred to in the meeting in which Perry was told of his discharge. *See* Ford Aff. at Exh. N. In addition to indicating point by point the various items that McBride wanted to discuss at the meeting (continuation of salary and bonus, date for collecting personal belongings, etc.), the memo notes Perry's birthdate as well as a calculation of how old he was at the time of the meeting (55 years of age) in the top right hand corner. Moreover, under Arabic number "4" in the column entitled "PBS will provide", the memo states (in addition to the salary and bonus described above which were marked next to numbers "1" and "2") in McBride's handwriting: "4) pension will be funded to age 65 level". *Id.; See* McBride Dep. at 97 (affiant's oral recapitulation of the contents of the note).

Perry asserts that the age calculation in the upper right hand corner of the document constitutes tangible proof that age was a key consideration in the thoughts of the Pru–Bache executives who discharged him. *See* Perry Opposition Brief at 12. At his deposition, McBride did not dispute that he placed Perry's age in the upper corner of the document, or that he did so to have in mind Perry's age at the time he advised him of the discharge. McBride states,

---

**3.** In his opposition papers, Perry correctly points out that the gross revenues generated by the Municipal Department during the 1985 calendar year were approximately $94,000,000.00, a figure which represents an almost 50% increase over the previous year's figures. Perry Opposition Brief at 10. Regardless of how impressive this figure may appear to be, the real factual inquiry relevant to this appeal is not whether the Municipal Department experienced gain or even loss, but rather, whether the management at Pru–Bache were satisfied with Perry's performance of his role.

however, that he made the notation as a means of calculating the number of years required were the company to fund Perry's pension as if he had reached age 65 and that the calculation was merely part of the item to be discussed under item "4", i.e., the possibility of funding Perry's pension until he should reach the standard retirement age. McBride Dep. at 97–98.[4] The decision to terminate Perry had already been made. McBride informed Perry of the company's decision to terminate him, and stated that it was time for "new blood" or "new leadership" at Pru–Bache. Perry Dep. at 174.

Perry asserts that he was surprised to hear that he was being terminated, and that his superiors were disappointed in his management of the Municipal Department. After his discharge, Perry wrote a letter to Chairman Ball, asking for a more detailed explanation of the reasons for his termination. Perry Opposition Brief at 14–18. Ball's response was rather general, and stated that often a company simply needs change. *See* Ford Aff. at Exh. P. Perry sent a second letter to Ball and raised allegations of age discrimination. *Id.* at Exh. Q. He did not receive a response. Perry Opposition Brief at 17.

Perry was replaced by Thomas Monti (hereinafter "Monti"), who was then age 41. Monti joined the company in October, 1986, and was discharged in August, 1988, supposedly because of a personality conflict which developed between himself and McBride. Deposition of Thomas J. Monti, taken December 22, 1988 (hereinafter "Monti Dep.") at 48–49 (deposition attached to the Green Aff. at Exh. F.)). McBride subsequently took over the job of Manager of the Municipal Department, and no new employee has been hired to fill the position. Affidavit of Gerald P. McBride, sworn to

August 16, 1989 (hereinafter "McBride Aff.") at para. 3.

## III. DISCUSSION

■ A court may only grant a motion for summary judgment if the pleadings, depositions, affidavits, and other elements of the record show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c). *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3rd Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The burden of demonstrating the absence of a dispute as to material facts remains with the party which moves for summary judgment, a burden which will be met by showing that the evidentiary material in the record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex,* 477 U.S. at 323, 333, 106 S.Ct. at 2552, 2558.

■ When a plaintiff brings a cause of action under the ADEA, he or she bears the ultimate burden of proving that age was a determinative factor in the defendant employer's decision. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3rd Cir.1988); *Anastasio v. Schering Corp.,* 838 F.2d 701, 705 (3rd Cir.1988); *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 (3rd Cir.1984), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). The plaintiff need not prove that age was the employer's sole or exclusive consideration, but must prove that age "made a difference" in the termination decision. *Duffy,* 738 F.2d at 1395 (*quoting Smithers v. Bailar,* 629 F.2d 892, 898 (3rd Cir.1980).

---

**4.** Perry asserts that McBride's deposition testimony on this point is unworthy of belief. Perry notes that McBride initially testified that he could not recall why he had placed Perry's age in the corner of the document, and that McBride only remembered his "reason" for doing so after a break in the deposition and after a conference with his counsel. *See* Perry Opposition Brief at 12; McBride Dep. at 67, 97–98; Ford Aff. at Exh. X. Pru–Bache's attorneys

have described this remark as a "desperate and outrageous accusation" which implies that Pru–Bache attorneys have committed a fraud on the Court and a "regrettable tactic" undertaken to make up for a "woeful lack of evidentiary support" for plaintiff's case. *See* Defendant's Reply Memorandum Of Law In support Of Its Motion For Summary Judgment (hereinafter "Pru–Bache Reply Brief") at 20.

■ A plaintiff may meet the burden of proving that age made a difference in the decision to terminate through either direct or indirect evidence. If direct evidence of discrimination exists, the case proceeds as any other civil case, and the plaintiff must proceed with the usual indicia of proof. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853–854 (3rd Cir.1987), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

■ I shall first address Perry's claim that direct evidence exists to support his allegations of age discrimination. First, Perry asserts that on occasion he was the object of "joking" remarks concerning his age. As Perry testified in his deposition, an example of this might include a remark such as "How old do you say this guy is?" or "When does this guy say he is going to retire?" *See* Perry Dep. at 49; Ford Aff. at Exh. X. While these remarks were delivered "in almost a jocular way", Perry did not find them amusing and felt that they were in bad taste. *Id.* While I agree with both observations, I cannot agree that the remarks constitute direct evidence of age discrimination. *See* Note 5, *infra.*

■ Second, Perry also has produced deposition testimony of a former Pru-Bache executive, Richard Poirier (hereinafter "Poirier"), in which Poirier claims to have heard Perry's supervisor, McBride, making one or, perhaps, two derogatory remarks in which Perry's age was invoked. Poirier's testimony, which is both equivocal and vague, concludes that, after Perry forgot to turn in a bid on a bond issue, i.e., "one isolated incident", McBride, who was angry, referred to Perry as a "stupid old bastard" (although Poirier was uncertain of the exact quote) who was "burned out and forgetful". Ford Aff. at Exh. X2.

It must be remembered that "Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence". *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016 (1st Cir.1979). When Poirier's deposition testimony is reviewed in its entirety, and

not excerpted as it is in Perry's brief, it is quite clear that McBride's one remark was made in utter exasperation and in the context of McBride's dissatisfaction with Perry's failure to act vigorously and competently in the execution of his duties. Stated somewhat differently, this remark speaks not in any significant fashion to Perry's age but, rather, to his adequacy as an executive and his complete foulup on an important matter. *See Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 610–611 (11th Cir.1987) (assertion that old employee could not pass a physical exam not considered to be direct evidence of age discrimination); *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988) (Manager's comment that employee "moved in slow motion" and was the same age as manager's father considered to be merely descriptive and not discriminatory).

Moreover, I have grave doubts that McBride's remark as recounted by Poirier can be said to constitute *direct* evidence within the context of an age discrimination case. McBride's remarks do not state that Perry was to be fired because of his age and any such conclusion must be *inferred* from the description of Perry as being "old". *See Young*, 840 F.2d 829; *See further, Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n. 13 (11th Cir.1988); *Williams v. General Motors Corp.*, 656 F.2d 120, 130 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

In turning now to Perry's assertion that indirect evidence exists to support his claim of age discrimination, I note that it is often the case that no direct proof of discrimination will exist, and that the employer's motives will have been masked behind the facade of conducting usual business activities. In such a situation, the law permits a plaintiff to prove discrimination through the indirect framework of proof first developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In this three step process, the plaintiff must first make out a prima facie case of age discrimination. If the plaintiff succeeds in setting forth a

prima facie case, the burden then shifts to the employer to articulate legitimate, non-discriminatory reasons for the employee's dismissal. Finally, in the event that the employer meets its burden of producing nondiscriminatory reasons for the discharge, the burden shifts back to the employee to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons for the discharge, but were rather a pretext given to shield a discriminatory motive. *See further, Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981).

While the prima facie case will vary depending upon the specific facts presented in each employment situation, *McDonnell*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, I find that in order to make out a prima facie case here, Perry must show that 1) he was a member of the class of persons protected by the ADEA (*i.e.*, over the age of forty); 2) he was qualified for the position which he held; 3) he was discharged from that position; and 4) another employee of a sufficiently younger age was hired as a replacement so as to create an inference of age discrimination. *See Healy*, 860 F.2d at 1214.

■ In examining Perry's assertions within the context of the *McDonnell* framework of indirect proof, I find that Perry has failed to establish the prima facie case necessary to create an inference that discrimination lay behind his discharge. It is clear that Perry meets three of the four criteria of the prima facie case: he was fifty-five years old at the time Pru–Bache decided to terminate his employment, and another employee of sufficiently younger age took his place. Perry's case falters, however, in demonstrating the remaining criterion, that is, that he was qualified for the position which he held. As the Third Circuit has noted, a claim for age discrimination will not lie against an employer for taking action which results in the termination of an employee when it is clear that, although an employee was qualified for the technical aspects of his job, he was not qualified for the managerial aspects of his job. *Spangle v. Valley Forge Sewer Authority*, 839 F.2d 171, 173 (3rd Cir.1988) (prima facie case not established where employee fails to supply evidence to support a finding that he was performing the managerial aspects of his job well, although there was no question that he performed the technical aspects of his job in a satisfactory manner).

■ I find the reasoning in *Spangle* to be dispositive here. While there can be no doubt that Perry performed the technical/financial work as National Manager of Underwriting with great skill, acumen in this area was only a part of the new position he assumed when he became Manager of the Municipal Department in 1985. While Perry's opposition papers are filled with evidence of the high calibre of his work as an underwriter, nowhere has he produced evidence to support a finding that he performed his supervisory obligations in a manner that was satisfactory to his employer.

■ Even assuming that Perry was qualified for the position which he held, and, thus, that a prima facie case has been made out, there is simply insufficient evidence to show that the reasons proffered by Pru–Bache for the termination of Perry's employment were a pretext for discrimination. In this context, as has been noted by several courts in our Circuit, a plaintiff must do more than just show that he was qualified for the position. He must also introduce evidence that casts doubt on his employer's contention that there was a legitimate business justification for letting him go. *See Healy*, 860 F.2d at 1212; *Turner v. Schering–Plough Corp.* 705 F.Supp. 1048, 1051 (D.N.J.1989).

■ Perry believes that such doubt exists and points to the age notations on the McBride memo utilized during the meeting at which Perry was terminated, as well as the fact that he received a favorable "9" rating on an evaluation form in the year in which he was terminated. I find this evidence unpersuasive.

Addressing the matter of the 1986 evaluation form first, it is clear that this evaluation is simply not indicative of the manner in which Perry was viewed at or about the time of his discharge. The form clearly indicates that the "9" rating was a rating given to him more than a year earlier in his previous position. Any further evaluation by means of salary adjustment has been marked "defer". *See* Ford Aff. Exh. L. Even were the single digit "9" to be indicative of excellent performance prior to February, 1986, when the evaluation was prepared, seemingly consistent with Perry's promotion to Manager of the Municipal Department, "promotion from a lower level job does not mean that problems do not exist which could affect performance in a more demanding job". *Turner*, 705 F.Supp. at 1051 (*noting Healy*, 860 F.2d at 1215.

As to McBride's notes regarding Perry's age, I find that these computations represent exactly what they appear to be, *i.e.*, calculations regarding the possibility of funding Perry's pension. To assert that an employer is incapable of ever mentioning or noting an employee's age in a discharge situation would be to work the absurd result that an employer could not discuss severance packages and pension calculations with a departing employee or with other members of the firm. The notation as to date of birth and age in the upper corner of the document were clearly part and parcel of the retirement package which was directly communicated to Perry at the meeting. There was no secret as to the fact that the company was considering bridging Perry's pension, or that the firm would obviously need to know Perry's age in order to do so.

Finally, Perry argues that the assertions of Pru–Bache executives as to their beliefs regarding the quality of his work is a subjective matter which presents issues of credibility and is, thus, peculiarly unsuited for disposition on summary judgment. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3rd Cir.1987); *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200 (3rd Cir. 1987); Perry opposition Brief at 35. As Perry correctly points out, *Chipollini* emphasized that the issue of defendant's intent at the time of discharge is inherently a factual question, and that summary judgment should not be granted where the plaintiff can introduce evidence calling into question the defendant's motive regarding the discharge. *Chipollini*, 814 F.2d at 901.

That is simply not the case here, for Perry has not presented this Court with anything which would call into question the credibility of Pru–Bache executives or tend to demonstrate that Pru–Bache acted with an impermissible motive. Obviously, without counter-affidavits or other evidence that there is reason to disbelieve the employer's "legitimate" reasons for discharge, a plaintiff will be deemed to have failed to set forth an issue of fact, and thus failed to have demonstrated that the proffered reason was a pretext for discrimination. *See Healy*, 860 F.2d at 1219; *Turner*, 705 F.Supp. at 1051.[5]

I turn now to the state law claims brought under New York and New

---

5. While Perry points to both the casual and "almost jocular" remarks concerning his age and the fact that McBride stated that the firm was looking for "new blood" or "new leadership", I find neither of these of sufficient evidentiary value to discredit the legitimate motives put forth by Pru–Bache as reasons for the discharge. As to the remarks concerning Perry's age, Pru–Bache correctly points out that offhand comments of a joking nature are rarely considered to create sufficient doubt so as to raise an inference of intentional discrimination, and cannot be so viewed here. *See, e.g., Mantione v. Ted Bates Advertising*, 38 Fair Empl. Prac.Cas. (BNA) 1457, 1462, 1985 WL 2516 (S.D. N.Y.1985) (Description of employee as "Santa" in retirement comment insufficient to warrant finding of intent to discriminate); Pru–Bache Movant Brief at 49–50. I agree.

As to McBride's comment that the firm needed "new blood", I take this to mean nothing more than that Pru–Bache wanted to *change* employees, whether they be younger or older. Indeed, as one circuit has noted, even if McBride had used the more suggestive phrase "younger blood" instead of "new blood" or "new leadership", this would be insufficient to preclude the granting of summary judgment. *See Gagne v. Northwestern Natl. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989).

Finally, it is important to point out that Perry held one of the highest and most vital positions within Pru–Bache. His decisions affected millions of dollars worth of the firm's capital and

Jersey law. As a preliminary matter, I note that choice of law principles dictate that, given the New York employment at issue here, New York and not New Jersey law should be applied in this case.[6] Accordingly, Perry's New Jersey claims will be dismissed, as they have been inappropriately raised.

In Count Five of his Amended Complaint, Perry asserts that he was unlawfully discharged from his employment in violation of N.Y. Executive Law §§ 296 (McKinney 1982), which prohibits an employer from discriminating against its employees based upon age. I note, however, that a detailed inquiry into New York law is not required, inasmuch as New York follows the framework established for resolving federal claims brought under the ADEA, which I have already reviewed. *See Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985). Accordingly, for the reasons set forth above in connection with Perry's ADEA claims, I shall also grant summary judgment for Pru–Bache on Perry's New York claims.

Defendant Pru–Bache's Motion for Summary Judgment will be granted. An appropriate order will issue.

---

the overall profitability of the company's bond positions were directly affected by his management style and approach to the job. Under such circumstances, it is eminently appropriate that the subjective estimation of his performance should be treated with deference. *See Pirone v. Home Ins. Co.*, 559 F.Supp. 306 (S.D.N.Y.1983). Pru–Bache has noted this in its brief, and indeed has cited *Pirone* in relevant part: "[Plaintiff] was at the highest level of power and responsibility at [the insurance company which employed him], and the subjective evaluation of his chief that he should be let go must be accorded great respect". *Id.* at 310–311. On this basis alone, the undisputed friction which existed between Perry and Gahan—such that they could barely speak to one another—might well have constituted grounds for termination.

6. Under the rule established in *Klaxon Co. v. Stentor Electric*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court applying state law must utilize the choice of law analysis of the state in which it is located. *See also Dent v. Cunningham*, 786 F.2d 173, 176 (3rd Cir.1986). New Jersey utilizes a modern conflicts approach, which seeks to have the forum with the most significant contacts to the dispute apply its law in determining the rights and liabilities of the parties. *See Rose v. Port of N.Y. Auth.*, 61 N.J. 129, 140, 293 A.2d 371 (1972). On the facts presented, it is clear that New Jersey would apply New York law to determine the resolution of this dispute. *See Shamley v. ITT Corp.*, No. A–4728–87T1 (N.J.Super.Ct.App.Div., Dec. 27, 1988) (*held:* New York law applies to a claim brought by a New Jersey resident against his New York employer; public policy dictates that employers in New York should not be subject to differing rules of law based upon the varying location of employees' domiciles). *See further, Shamley v. ITT Corp.*, 869 F.2d 167, 171 (2d Cir.1989).