Francine GREEN, Plaintiff,

v.

FAIRFAX COUNTY SCHOOL BOARD,
et al., Defendants.

Civ. A. No. 93–0104–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 7, 1993.

John M. Bredehoft, Charlson & Bredehoft, Fairfax, VA, for plaintiff.

Thomas J. Cawley, Kimberly Anne Newman, Hunton & Williams, Fairfax, VA, for defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

This matter came before the court on the defendant Fairfax County School Board's Motion for Summary Judgment. Plaintiff Francine Green has sued defendant Fairfax for alleged sexual discrimination, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and unconstitutional denial of due process and equal protection of the laws pursuant to 42 U.S.C. § 1983.

Due to shrinking tax revenues, the Fairfax County School Board decided to reorganize the school system and reduce the number of its employees. A total of 299 full-time non-school based support positions were eliminated in the past two fiscal years. These job reductions occurred in all school system departments and at all levels of the bureaucracy.

As part of the budget cuts, the position held by Francine Green, was eliminated on July 1, 1992. At the recommendation of Mrs. Green's superior, Assistant Superintendent for Management Information Services Marjorie Oughton, four directorships were consolidated into two. Green had been a director.

To ease the impact of its budget cuts, the Board permitted displaced persons to remain employed by moving to a lower position and freezing their salaries for two years. All displaced employees are eligible for promotions in the future. Mrs. Green alleges sexual discrimination because she was not chosen for the one of the two consolidated positions. Mrs. Oughton has testified that she chose Mr. William Lang and Mr. John Jenkins because they had good communication skills and would help restore morale in the Division. Mrs. Oughton viewed Mrs. Green as having poor communication skills. In addition, Mrs. Green's subordinates did not like her.

Mrs. Green has stated that she "respects" Mr. Jenkins and Mr. Lang. Although Mrs.

Green admits that she does not know their qualifications, she maintains that she was "uniquely qualified" for a director's position.

Mrs. Green filed a grievance with the Deputy Superintendent of Schools that she was not selected for a director's position due to Mrs. Oughton's age and sex discrimination. Eventually, the Fairfax County Civil Service Commission found no age or sex discrimination or retaliation against Mrs. Green. Because the Chairwoman of the Commission felt that Mrs. Oughton did not adequately articulate her reasons for selecting the two directors, however, a four member panel was formed to give independent advice on the selection of the two directors.

The panel's members were: Rachael Verville and Elliot Krash, both women from the school system who Mrs. Green has described as "great," Daniel Jackson of the Office of Human Relations with whom Green had "no problem," and Stephen Raucher, director of Montgomery County, Maryland's Management Information Systems Department.

Mrs. Green only applied to become the Director of Systems Development, not Director of Operations. The panel met with each of the four applicants and gave Mrs. Oughton a list ranking the applicants for each position. For the Director of Systems Development, the panel recommended: 1) Michael Shaulis; 2) Francine Green; 3) John Jenkins and; 4) William Lang. For the Director of Operations, the panel recommended: 1) Michael Shaulis; 2) John Jenkins and 3) William Lang.

The panel informed Mrs. Oughton that Mr. Shaulis preferred the Systems Development post. Following the panel's recommendation, Mrs. Oughton appointed Mr. Shaulis as Director of Systems Development and Mr. Jenkins as Director of Operations. Mrs. Green never filed any grievance about not being selected Director of Systems Development.

Mrs. Green claims that Mrs. Oughton retaliated against her for filing her grievance by excluding her from planning meetings relating to the new organizational structure. She also alleges that Mr. Jenkins was rude to her at various times and holds Mrs. Oughton responsible for this alleged attitude. Mrs.

Green also alleges that she failed to receive "credit" for involvement in a catalogue. Mrs. Green complained of this allegedly retaliatory treatment in a memo to Mrs. Oughton dated April 6, 1992. Mrs. Oughton responded on April 13, 1992 and stated that these allegations were "just things that happen everyday in an office."

As further evidence of Mrs. Oughton's allegedly discriminatory attitude toward women, Mrs. Green alleges that Mrs. Oughton once said that Mr. Lang reminded her of her father and described Mr. Jenkins as a "big teddy bear." In addition, Mrs. Oughton asked male directors to drive her to the train station, but never made such requests to Mrs. Green.

Mrs. Green has not reported to work since June, 1992, but remains a Fairfax employee. Mrs. Green is currently on leave without pay following a paid disability leave for a depressive disorder which she alleges results from not being hired as a director. Mrs. Green has admitted that her position remains available to her, that she was not fired, and did not resign. If Mrs. Green were to return to work, she would receive the same pay in her new position as she had as a director and would be eligible for promotions as positions become available.

■ Grants of summary judgment motions are warranted if the pleadings, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party will prevail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. Sex Discrimination

■ As the Supreme Court has recently reiterated, the ultimate issue in any discrimination case alleging disparate treatment is whether there was intentional discrimination. *St. Mary's Honor Center, et al. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In order to satisfy the burden of establishing proof of discrimination and to withstand summary judgment, Mrs. Green

must either produce 1) specific evidence of discrimination or 2) satisfy her burden under the judicially created proof scheme established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1982). *See EEOC v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992). Under either method, Mrs. Green must prove that gender was the determining factor; that "but for" the employer's intent to discriminate on the basis of sex, she would have not been adversely affected. *Clay,* 955 F.2d at 941; *Conkwright v. Westinghouse Electric Co.,* 933 F.2d 231, 234 (4th Cir.1991).

■ Under the *McDonnell Douglas/Burdine* proof analysis, Mrs. Green must first establish a *prima facie* case of discrimination by proving the following elements: 1) Membership in a protected class; 2) Application for the position in question; 3) Qualification for the position; and 4) rejection for the position in favor of a male under circumstances giving rise to an inference of unlawful discrimination. *Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 121 (4th Cir.1991).

■ If the plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for the employment action. The employer need only articulate a legitimate reason, and need not prove the absence of a discriminatory motive. *Clay Printing,* 955 F.2d at 941.

■ Mrs. Green cannot establish the second element of a *prima facie* case of discrimination regarding the selection for Director of Operations position, because she concedes that she never applied for that position. *Alvarado,* 928 F.2d at 121.

■ Mrs. Green cannot satisfy the fourth element of a *prima facie* case regarding the selection for *either* director position, because she cannot prove that she was rejected under "circumstances giving rise to an inference of unlawful discrimination." *Alvarado,* 928 F.2d at 121. There is simply no evidence from which an inference of unlawful discrimination can reasonably be made.

Mrs. Green concedes that her position was eliminated during the course of system-wide personnel reductions resulting from budgetary restrictions. The position of an identically situated male MIS director was eliminated by Mrs. Oughton during the reductions. Both times Mrs. Oughton made director selections, a male incumbent director was downgraded along with Mrs. Green. Of the six MIS positions Mrs. Oughton eliminated, three were held by men and three by women. The decisions Mrs. Green complains of were made by a woman, recommended by a four-person panel that consisted of two women, and applied equally to men. The overwhelming number of school system personnel are women, including over two thirds of the managerial staff. Also, the School Board's Chairman is a woman. There is not a scrap of evidence in this record from which sex discrimination can be inferred, and Mrs. Green cannot establish a *prima facie* case that Mrs. Oughton denied her a director's position because she is a woman.

■ The School Board can do more than meet its burden of articulating a non-discriminatory reason for Mrs. Green's non-selection. It can present overwhelming and undisputed evidence that the decision was not based on sex discrimination.

The initial elimination of Mrs. Green's position resulted from a universally recognized and legitimate, non-discriminatory business reason: The school system was reducing and streamlining its work force in response to budgetary constraints. The legitimacy of the school system's budget-induced reorganization is unchallenged and Mrs. Green herself approved Mrs. Oughton's budget-related organization of the MIS department, including Mrs. Oughton's elimination of two director-level positions. Thus, Mrs. Green's burden of proving discrimination is heightened by her concession of the objective truth of the reasons underlying the decision she challenges. *See Elliott v. Group Medical & Surgical Service,* 714 F.2d 556, 566–67 (5th Cir.), *rehearing denied,* 721 F.2d 819 (5th Cir. 1983), *cert. denied* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).

The undisputed evidence demonstrates that Mrs. Oughton made the director selections for legitimate, non-discriminatory reasons. Because of Mrs. Oughton's concern with departmental morale and organization, and her conclusion that all four of the candidates were technically qualified, Mrs. Oughton based her initial selections primarily on her assessment of the managerial and team-building skills of the candidates. Mrs. Oughton declined to choose Mrs. Green because of her conclusion that Mrs. Green lacked the supervisory and communications skills that Mr. Jenkins and Mr. Lang possessed. Mrs. Oughton's assessment of Mrs. Green's deficiencies was based on her own observations as well as complaints in late 1991 from the employees in the MIS information center, a group that made up half of the work force that Mrs. Green supervised. Even if Mrs. Green was technically proficient, Mrs. Oughton's reliance on Mrs. Green's supervisory deficiencies in rejecting Mrs. Green for a position that placed a premium on supervisory and communications skills was non-discriminatory. *See, e.g., EEOC v. Western Electric Co., Inc.,* 713 F.2d 1011, 1016 (4th Cir.1983); *Perry v. Prudential–Bache Securities, Inc.,* 738 F.Supp. 843, 852 (D.N.J.1989) (decisions based on supervisory deficiencies held non-discriminatory), *aff'd,* 904 F.2d 696 (3rd Cir.1990), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990).

Mrs. Oughton's adoption of the panel's recommendations was also legitimate and non-discriminatory. The four-member panel included two women and a black whose job with the school system is to ensure compliance with discrimination laws. There is not a shred of evidence that the panel discriminated against Mrs. Green. Rather, the panel selected Mr. Shaulis over Mrs. Green for the Systems Development directorship because of the uniform conclusion that Mr. Shaulis demonstrated the best technical grasp and vision of the department's role and because Mr. Shaulis indicated a preference for the Systems position. The panel did not consider Mrs. Green for the Operations directorship because she did not apply for it. Thus, the panel's director recommendations were not discriminatory and neither was the adoption of the recommendations by Mrs. Ough-

ton. Moreover, in order for Mrs. Oughton to have chosen Mrs. Green, she would have had to reject a male recommended for a directorship for a female without having any basis for such a decision. The school system would then have been faced with a sex discrimination claim from the male who ranked higher than Mrs. Green.

Further evidence that Mrs. Oughton did not discriminate against Mrs. Green is found in the complete sex-neutrality of Mrs. Oughton's elimination of positions in the MIS reorganization. The first time Mrs. Oughton selected directors, she downgraded a male incumbent director, Mr. Shaulis. The second time, when Mrs. Oughton followed the panel's recommendations, Mrs. Oughton again downgraded a male incumbent director, Mr. Lang. It is therefore undisputed that during the selection process Mrs. Oughton *twice* treated male incumbent directors identically to Mrs. Green. It is also uncontroverted that of the six MIS positions eliminated by Mrs. Oughton, half were held by women and half by men.

Mrs. Green cannot carry her burden of demonstrating that the legitimate reasons for the school system's decisions were a pretext for sex discrimination. The complete absence of evidence of sex discrimination is vividly demonstrated by Mrs. Green's complete inability to present any evidence whatsoever as to why the decision was made. When asked why she thought Mrs. Oughton discriminated against her, Mrs. Green responded, "What else can I conclude?" This is a rhetorical question, not evidence. Mrs. Green literally assumes that her gender was the reason for the decision because she was the only female candidate and cannot figure out any other reason for the decision.

■ Mrs. Green cannot withstand summary judgment on her discrimination claim merely by asserting that she is a woman *and* was not selected, rather, she must show that she was not selected *because* she is a woman. *Holmes v. Bevilacqua,* 794 F.2d 142, 145 (4th Cir.1986) (*en banc*). Mrs. Green's unsubstantiated assumption that she was discriminated against is insufficient to withstand summary judgment, particularly in the face

of the school system's overwhelming evidence that the decisions were made for legitimate, non-discriminatory reasons. *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir.1989).

Mrs. Green suggests that because she was "uniquely qualified" for a director's position, she was discriminated against. However, in position reduction cases, evidence of a plaintiff's qualifications does not establish discrimination, because a well-qualified person will frequently lose a position in such situations. *Conkwright,* 933 F.2d at 234. There was no question here that of the four qualified incumbent directors, two would lose their position in the budget-induced reorganization.

Mrs. Green also claims that Mrs. Oughton's alleged description of Mr. Jenkins as a "teddy bear" and Mrs. Oughton's statement that Mr. Lang reminded her of her father are evidence of discrimination. These statements are mere stray remarks unrelated to the decision making process at issue and are not evidence of discrimination. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989). The remarks on their face are simply descriptions, and not discriminatory, and they are not indicative of any intention by Mrs. Oughton to make any decision in any manner unfavorable to women. *See Perry,* 738 F.Supp. at 851 (citing *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Mrs. Oughton's alleged requests that male directors drive her to the train station are similarly unrelated to the decision making process at issue and are irrelevant and inconclusive as evidence of discrimination. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804.

Finally, any reliance by Mrs. Green on the Civil Service Commission hearing officer's decision as evidence of discrimination is misplaced and insufficient to withstand summary judgment. This court is not bound by the hearing officer's findings, but must review the facts *de novo* to determine whether there is evidence of intentional discrimination. *Rosenfeld v. Department of Army,* 769

F.2d 237, 239, 241 (4th Cir.1985). The Commission did not find that Mrs. Green was discriminated against, but rather concluded that the school system did not sufficiently articulate a non-discriminatory reason for its decision. The school system has since fully elaborated its non-discriminatory reasons.

Because Mrs. Green has failed to establish a *prima facie* case of disparate treatment and has provided no evidence of intentional discrimination against her, summary judgment on Count III must be granted in favor of the defendant.

## II. Retaliation

In order to establish a *prima facie* case of retaliation, Mrs. Green must prove by a preponderance of the evidence: 1) that she engaged in protected activity; 2) that the school system took adverse employment action against her; and 3) that there was a causal connection between protected activity and the adverse action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991). If a *prima facie* case is established, the school system may rebut the presumption of retaliation by articulating a legitimate, non-retaliatory reason for the decision, at which point the burden shifts to Mrs. Green to establish that the reason was a pretext for retaliation.

Mrs. Green's retaliation claim must be dismissed because she cannot establish the final two elements of a *prima facie* case. She identifies as adverse action 1) her failure to obtain a director position, 2) a series of issues identified in her April 6 memo to Mrs. Oughton, primarily concerning the conduct of Mr. Jenkins in planning for the transition to the reorganized MIS department, 3) the scheduling of department meetings and 4) alleged failure to afford her credit for work assignments.

None of this satisfies Mrs. Green's burden of proving that she was subject to adverse action. Mrs. Green was initially rejected for the directors' position before she engaged in protected activity by raising her grievance. Her failure to obtain a directors's position thus placed her in no more adverse a position than she was in before she filed her grievance.

Nor do the remaining issues raised by Mrs. Green constitute adverse action. She charges that Mr. Jenkins' pre-transition planning usurped her authority, that she was excluded from MIS transition planning meetings, and that she was not afforded the appropriate amount of credit for certain projects. True or not, these matters were nothing more than routine, day-to-day work occurrences, and none of the conduct adversely affected Mrs. Green's job position or compensation in any respect. Rather, the matters were merely "interlocutory or mediate decisions having no immediate effect on employment conditions" and "were not intended to fall within the proscription ... of Title VII." *See Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

In fact, far from engaging in adverse action, the school system afforded Mrs. Green *favorable* treatment on numerous occasions after she engaged in protected activity. The school system 1) agreed to follow the Commission's recommendation to convene a panel to reconsider Mrs. Green for a director's position, 2) responded to Mrs. Green's April 6 memo by advising Mr. Jenkins to proceed with transition planning in a manner more sensitive to Mrs. Green's concerns, 3) granted Mrs. Green six months of paid leave, 4) preserved Mrs. Green's ability to return to work despite her ten month absence, and 5) assisted Mrs. Green in obtaining paid disability benefits from the school system's insurance carrier. There is simply no evidence that Mrs. Green was subject to any adverse action.

■ Further, even if the school system's post-grievance action was adverse to Mrs. Green, she cannot satisfy the third element of a *prima facie* case, because she has no evidence that any purportedly adverse action was caused by the protected activity. The only conduct that could arguably constitute adverse action are the panel's recommendations and Mrs. Green's resulting failure to obtain a director's position. Because three members of the panel did not even know Mrs. Green filed a grievance, their decisions could not have been motivated by a desire to retaliate against Mrs. Green for engaging in

protected activity. The fourth member, Mr. Jackson, had limited knowledge of the grievance but did not consider it in his recommendations. Moreover, it is inconceivable that Mr. Jackson, the school system's official responsible for EEO compliance, would purposefully and unlawfully retaliate against Green in violation of Title VII. Indeed, the panel ranked Mrs. Green second out of four candidates, hardly an adverse or unfavorable rating.

Mrs. Green has no evidence of retaliatory or pretextual motivation. She testified that the only evidence she had was "the pain" she suffered and the events themselves. The mere fact that conduct took place which allegedly caused Mrs. Green pain does not constitute evidence that the conduct was either adverse or unlawfully motivated by retaliatory considerations. Mrs. Green's claim of retaliation in Count V must therefore be dismissed.

### III. Constructive Discharge

■ A plaintiff alleging constructive discharge must show both intolerable work conditions and a deliberate effort by the employer to force the employee to quit. *Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993). This theory of liability is to be applied sparingly in this circuit. Constructive Discharge claims must "be carefully cabined" by district court judges because "the claim of constructive discharge is so open to abuse by those who leave employment of their own accord." *Paroline v. Unisys Corp.,* 879 F.2d 100, 114 (4th Cir.1989), *adopted by majority en banc* at 900 F.2d 27, 29 (4th Cir.1990).

■ Mrs. Green cannot satisfy either element of a constructive discharge claim. Her claim fails for the fundamental reason that she has not resigned her employment and is still an employee of the school system. Mrs. Green cannot show that the school system "deliberate forced her to quit" because she has not quit. *See Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). It would stand logic on its head to allow an employee to raise a constructive discharge claim while still employed. Indeed, if the court were to hold

otherwise, it would become an accomplice with Mrs. Green in pulling a new theory of liability out of a hat labeled "constructive constructive discharge."

Nor is there any evidence of a deliberate effort on the school system's part to induce Mrs. Green's resignation. She is eligible to return to work at any time and has been so informed by the school system. Mrs. Green has no evidence of actual intent by the school system to drive her from employment and no evidence that she has been singled out for treatment intended to force her resignation. *Johnson*, 991 F.2d at 131; *Clay Printing Co.*, 955 F.2d at 944–46. To the contrary, the fact that Mrs. Green was treated identically to other employees—first Mr. Shaulis and then Mr. Lang—rebuts any inference of constructive discharge. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981).

■ Mrs. Green cannot establish that she was subjected to intolerable work conditions. While Mrs. Green apparently contends that the elimination of her director's position and the alleged "pain" she suffered as a result constitute intolerable work conditions, failure to obtain a position is insufficient as a matter of law to establish constructive discharge. *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Furthermore, the retaliation alleged by Mrs. Green cannot sustain her claim of constructive discharge, because, as already discussed, there was no retaliation against her.

■ Mrs. Green's claim that her work conditions were "intolerable" is ludicrous in view of the school system's accommodation of her numerous requests. Mrs. Green is an incumbent employee who has been paid tens of thousands of dollars in compensation and benefits to which she is entitled only because she is a school system employee. Mrs. Green has received this compensation and remains eligible to return to work, despite the fact that she has not worked a single day in ten months. She has received everything she has asked for from the school system except the director's position. This alone is insufficient to sustain a constructive dis-

charge claim. *Federal Reserve Bank*, 698 F.2d at 672.

Mrs. Green is attempting to parlay her inability to withstand her disappointment with her failure to obtain a competitive opening into a constructive discharge claim. Recognition of a constructive discharge action for employees unable to cope with lawful demotions during work force reductions would constitute precisely the sort of abuse that led to the Fourth Circuit to narrowly limit the application of the constructive discharge theory. *Paroline*, 879 F.2d at 114, *adopted by majority en banc* at 900 F.2d at 27. Indeed, Mrs. Green's position is that she can remain an employee, accept employee benefits, remain eligible to return to work at any time, and still maintain that she was constructively discharged. Because Mrs. Green's constructive discharge claim is specious, Count IV must be dismissed.

### IV. Constitutional Claims

■ The threshold inquiry in every case containing allegations of municipal liability under § 1983 is whether there is a direct causal connection between a municipal policy, decision, or custom and the alleged constitutional deprivation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989). A municipal body, like a school board, is not liable under § 1983 simply because it employs a tortfeasor. *Schneeweis v. Jacobs*, 771 F.Supp. 733, 739 (E.D.Va.1991), *aff'd* 966 F.2d 1444 (4th Cir.1992). A school board can only be held liable if one of its policy statements, ordinances, regulations, or decisions officially adopted by that body's officers caused a constitutional tort. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Fairfax has neither officially nor unofficially ever adopted or promulgated any policy or decision endorsing or ratifying sex discrimination.

■ The School Board has officially done the opposite. It has adopted a policy which expressly prohibits any form of gender discrimination. It has also promulgated grievance procedures for any employee who suspects that her supervisor has acted in contravention of this policy. That grievance proce-

dure provides for a five-step appellate procedure which culminates in a finding by an independent Civil Service Commission which is advisory to the Division Superintendent. Mrs. Green herself utilized these grievance procedures once and obtained at least partial relief resulting in the independent panel being convened to select the best candidates. The School Board's official grievance process was created to ensure such compliance with the School Board's official policy.

Besides its official policy, the School Board has never unofficially adopted a policy of gender discrimination. Although Mrs. Green alleges that the School Board has a practice or custom of discriminating against women, Mrs. Green proffers no such evidence in this case. To the contrary, women comprise over two thirds of the school system's management. Indeed, the School Board's Chairman is a woman.

 Mrs. Green also cannot prove an unofficial School Board policy, even assuming *arguendo* that Mrs. Oughton did discriminate against Mrs. Green, because that allegedly isolated unlawful act was not done by an official cloaked with the School Board's final policymaking authority. A single decision can sometimes be sufficient to establish an unconstitutional governmental policy but only when that decision is made by the "highest officials responsible for setting policy in that area of the government's business." *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Whether a particular official has "final policymaking authority" in personnel matters for purposes of § 1983 liability depends on state law. *Id.* at 123, 108 S.Ct. at 924. Nowhere in the state code or regulations does the General Assembly bestow upon a supervisor, like Mrs. Oughton, final policymaking authority over any of the School Board's business. Therefore, a supervisor, like Mrs. Oughton cannot render the School Board liable for discrimination in this case.

Even though Mrs. Oughton, as an Assistant Superintendent, arguably possessed a right to choose the candidates for the two director positions, she still did not possess final authority over the grievance process which is necessary for § 1983 liability. In *Praprotnik*, the Supreme Court rejected the contention that a civil servant's authority to initiate transfers and layoffs was tantamount to the authority to establish employment policy for a governmental entity:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Id.* at 127, 108 S.Ct. at 926. Mrs. Oughton held no sway over the grievance process · so her actions alone could not inculpate the School Board.

 Only the School Board itself, as the exclusive holder of final policymaking authority for the school system, could render a decision in isolation sufficient to establish liability for § 1983 purposes. The Virginia Constitution and Virginia Code vest the School Board with the exclusive authority over the management and operation of the Fairfax County public school system. *See* Va. Const. art. VIII, § 7; Va.Code § 22.1–28; *see also Bristol Virginia School Board v. Quarles*, 235 Va. 108, 119, 366 S.E.2d 82, 88 (1988). Therefore, Mrs. Green must show that the School Board itself made a decision sufficient to establish an unofficial policy of discrimination. This she cannot do for two reasons.

First, the School Board did not render any decision involving Mrs. Green's complaint. Although Mrs. Green attempted to sidestep the grievance process after the panel made its recommendations by complaining directly to the School Board Chairman, the chairman's conciliatory response did not amount to School Board action. The Chairman of the School Board only has the powers conveyed to her by statute, and they do not include the right to make school board policy

or to hear grievance appeals. *See, e.g.,* Va. Code §§ 22.1–76 *et seq.* Indeed, the Virginia Supreme Court, in holding that an ordinance referring to a school board was not applicable to its members, has stated:

There is a clear distinction between a school board as an entity and a school trustee as an individual. The prerequisites and powers of a public body are not the same as those of an individual member of that body.

*City of Colonial Heights v. Loper,* 208 Va. 580, 585, 159 S.E.2d 843, 847 (1968). It follows that the Chairman does not have the power under state law to make final policy regarding the administration of personnel on behalf of the school system.

Second, even if the Chairman's response to Mrs. Green's letter of June 30, 1992, constituted an act she undertook on behalf of the School Board, it did not amount to ratification of unlawful conduct:

Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them.

*Id.; Crowley v. Prince George's County, Md.,* 890 F.2d 683, 685–87 (4th Cir.1989). In other words, Mrs. Green must show that the School Board not only ratified the decision but the basis for it and thus "made a calculated choice to follow the course of action deemed unconstitutional." *Pachaly v. City of Lynchburg,* 897 F.2d 723, 726 (4th Cir. 1990); *see also Williams v. Ellington,* 936 F.2d 881, 884–85 (6th Cir.1991) (single isolated decision by a school board to ratify warrantless strip search made pursuant to lawful policy was insufficient to establish § 1983 liability). Absent any proof that the School Board ever knowingly ratified unconstitutional conduct, or in any way endorsed discrimination or retaliation, either by policy, custom, decision, or practice, both Mrs. Green's due process claim and equal protection claim fail.

■ Mrs. Green contends that she was denied due process because she did not receive the relief she sought. This allegation alone is insufficient to state a claim for procedural due process.

[T]he very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case. . . .

*Walters v. National Association of Radiation Survivors,* 473 U.S. 305, 321, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985). Never during her deposition or discovery did Mrs. Green identify any process that she felt she was denied.

■ Mrs. Green could not do so because she received abundant due process in this case. Within days of learning of Mrs. Oughton's decision to select two other directors for the new director positions, Mrs. Green initiated the grievance process. Pursuant to Policy No. 4462, she complained first to Mrs. Oughton, then she appealed to Deputy Superintendent Mr. Jay D. Jacobs. When Mr. Jacob's decision afforded her less than complete relief, Mrs. Green finally took her case before the Civil Service Commission. After a hearing, a Civil Service Commission hearing officer issued an advisory opinion which recommended that an independent panel be convened to help select the director positions. The Division Superintendent took that advice. Although Mrs. Green was disappointed by the outcome of the panel selection process, she grieved no more. Therefore, she not only received all of the process that she was due, she also voluntarily abandoned her right to seek additional relief.

■ Exactly what additional process Mrs. Green asserts she could be due under these circumstances is not defined. Nowhere in the Virginia Code does the General Assembly set forth Grievance procedures for a school board's civil servants, unlike its teachers. *See* Va.Code § 22.1–306. Outside of any statutory requirements, the definition of due process will depend on the importance attached to the interest deprived and the circumstances under which its deprivation occurred. *Matthew v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). So long as the unauthorized conduct is not sanctioned by any established proce-

dure and the procedure affords the plaintiff a realistic means to be made whole, there is no denial of procedural due process, even if the defendant's actions were intentional. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). Given the extensive grievance procedures available to Mrs. Green and her inability to identify what, if any, additional process she was due, Count I, must be dismissed.

█ This court cannot hold the School Board liable under Mrs. Green's equal protection claim because the School Board has offered a legitimate non-discriminatory reason for Mrs. Green's non-selection. Mrs. Oughton testified that documented evidence regarding Mrs. Green's weak management and communication skills led to her initial selection of Mr. Jenkins and Mr. Lang, instead of Mrs. Green, for the two director positions. In addition, an independent panel subsequently found Mr. Shaulis to be more qualified for the only position for which Mrs. Green had applied. In light of this evidence, Mrs. Green's equal protection claim does not withstand scrutiny:

> The Equal Protection Clause in the context of a discharge case does not require that all persons be treated identically. If distinctions between similarly situated individuals are to withstand an equal protection analysis, such distinctions must be reasonable, not arbitrary, and must rest on grounds having a fair and substantial relation to the object of the rule. If the defendants offer a rational justification for the plaintiff's discharge . . . ., then plaintiff's equal protection claim must fail.

*Gilbert v. West Georgia Medical Center Authority*, 629 F.Supp. 738, 744 (N.D.Ga.1985), aff'd, 784 F.2d 402 (11th Cir.1988). Since leadership and communication skills, in addition to technical qualifications, are reasonable requisites for the director positions, neither Mrs. Oughton nor the panel's criteria run afoul of the equal protection clause.

█ Moreover, as discussed in the context of Mrs. Green's Title VII charges, there is absolutely no evidence of sex discrimination at any stage of the selection process. Even if the court were to assume that Mrs. Oughton exercised poor business judgment in

her initial selection of Mr. Lang and Mr. Jenkins, this determination alone is insufficient to support an equal protection claim:

> Title VII and the equal protection clause prohibit employment discrimination on the basis of sex. They do not prohibit discrimination on the basis of personal favoritism, grudges, or other arguably unfair or improper motives.

*Baltzer v. City of Sun Prairie/Police Dept.*, 725 F.Supp. 1008, 1022 (W.D.Wis.1989). Without any evidence of sex discrimination and faced with legitimate, non-discriminatory reasons for the non-selection of Mrs. Green, this court must dismiss Count II on the merits.

For the foregoing reasons, the defendant's Motion for Summary Judgment should be GRANTED as to all counts.

An appropriate order shall issue.

### ORDER

For reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that the defendant Fairfax County School Board's Motion for Summary Judgment is GRANTED and this case is DISMISSED as to all counts.